**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES,**<br><br>       **Plaintiff-Appellee,**<br><br>   v.<br><br>**COCHIS MANCIA,**<br><br>       **Defendant-Appellant.** | **1:07-cr-00241-OWW**<br>**(Mag. No. P0618480)**<br><br>**STATEMENT OF DECISION AND ORDER REGARDING APPEAL FROM MAGISTRATE JUDGE DECISION** |

### I. <u>INTRODUCTION</u>.

Appellant Cochis Mancia ("Mancia") was found guilty of violating 36 C.F.R. § 2.30(a)(1), which prohibits misappropriation of property, after a bench trial before a United States Magistrate Judge on August 29, 2007. Mancia appeals his conviction pursuant to 28 U.S.C. § 3402. (Doc. 1). Appellant filed an opening brief on May 9, 2008. (Doc. 25). The United States filed its opening brief on December 19, 2008. (Doc. 30). Appellant filed a reply on April 10, 2009. (Doc. 35).

### II. <u>FACTUAL BACKGROUND</u>

**Ranger Siler's Testimony**

On or about 12:00 am on July 18, 2006, National Park Service Ranger Michael Siler ("Siler") was conducting bike patrol of an area known as Curry Village within the boundaries of Yosemite

1

National Park. (RT at 3-7). Siler observed four individuals, one of whom was Mancia, walking through the east parking lot at Curry Village "being loud." (RT at 6). Siler followed the group as they walked toward the shower building at Curry Village and watched the individuals walk into a back dock area behind the Curry Village Store. (RT at 7). The individuals disappeared from Siler's. (RT at 33). A few moments later, the individuals emerged from the back dock area carrying three jugs of water. (RT at 33-34).

Siler testified that he approached the individuals and identified himself as a Park Ranger, at which point the individuals started to "split up." (RT at 34). Siler detained the individuals radioed for additional assistance. (RT at 36). Siler stated that he began to identify the individuals, and that Mancia stated he "would bring back the water" if Siler wished him to do so. (RT at 16). Siler determined that the other individuals in Mancia's group were juveniles. (RT at 45). Siler testified that Mancia never made any statements indicating that he had paid for or owned the water. (RT at 17). Siler asked Mancia where he obtained the water, and Mancia replied only that he would return the water if Siler wanted him to. (RT at 17). Siler testified that he "did not recall any statements" by Mancia that he had purchased the water. (RT at 195).

Eventually, two or three Delaware North Corporation ("DNC") security officers arrived on the scene, and Siler testified that he spoke with DNC security regarding the water. (RT at 38). Siler testified that he did not speak to any other non-park employees about the water. (RT at 39). Siler testified that he could not "swear 100 percent that there wasn't someone else around" other

**2**

than Mancia and his group, other rangers, and DNC security. (RT at 48).

Siler testified that he smelled alcohol on Mancia as well as the "group as a whole." Siler did not issue any alcohol related citations to the minors in Mancia's group. (RT at 47). Siler issued Mancia a citation for misappropriation of property. (RT at 47).

**Stephanie Matern's Testimony**

DNC Security Officer Stephanie Matern ("Matern") testified that she responded to the scene at Curry Village after she overheard a radio message regarding the incident. (RT at 51). Matern stated that she witnessed four to six individuals sitting on a low wall near the back door entrance to Curry Village when she arrived, and that there were already multiple rangers on the scene. (RT at 51). At some point, Matern had a conversation with Siler about the water jugs. (RT at 56). Siler asked Matern to determine the value of the water jugs. (RT at 56). Matern stated that typically, there would be "a few to none" employees encountered at the back area of Curry Village during the midnight hour on any given day. (RT at 55). Matern did not recall observing any other DNC employees on the night in question. (RT at 56).

Matern was recalled by the government later in the proceeding. During her second stint testifying, Matern stated that seeing a man in a jersey with a towel around his neck "sound[ed] familiar," but she could not say for sure whether she recalled seeing the man. (RT at 181-82).

In response to an inquiry by the Court, Matern stated that she "couldn't say specifically" what would happen to a DNC employee for

**3**

"engaging in private backdoor sales of DNC merchandise for cash," but Matern "imagined" that they would be fired. (RT at 184).[1]

At the conclusion of her testimony, Matern revealed that she had prepared a written report concerning the July 18 incident. (RT at 185). The government failed to produce a copy of the report to the Defense prior to trial. (RT at 186-87). Matern's report indicated that she was told that the group had been stopped for a possible minor in possession charge. (RT at 188). Matern stated that she believed Siler told her about the minor in possession suspicion, but she was not sure. (RT at 187-88). The report also indicates that Siler told Matern that the four individuals had been found "in the dungeon area, downstairs behind the gift shop." (RT at 189).

**Jim Webb's Testimony**

Jim Webb ("Webb"), the grocery manager for DNC in Yosemite, testified that shipments of water arrive to the DNC retail stores in the park on Mondays, Wednesdays, and Fridays. (RT at 66). Webb testified that water that could not be stored inside the store would be kept in the back area of the Curry Village grocery store. (RT at 67). Webb testified that employees are scheduled to work past eleven o'clock at night "very rarely." (RT at 71).

**Mancia's Testimony**

Mancia testified that he arrived in Yosemite at approximately 11:30 pm on the night of the incident with Jennifer Underwood ("Underwood"), Amicho Jerel Mancia ("Amicho"), Nathaniel Velasquez

---

[1] Contrary to the implication advanced in the trial court's question, Mancia's testimony was that the employee stated his intention to ring the sale up in the morning, making it a DNC sale, not a "private backdoor sale."

**4**

("Velasquez"), and Anthony Trejo ("Trejo"). (RT at 74-75). Mancia and his friends went directly to the Curry Village parking lot and began looking for a place to buy food and water. (RT at 75).

Mancia and his group walked up a path that led to the back area of the Curry Village Store, where he encountered a young man in a green polo shirt. (RT at 77). Mancia asked the young man where he could get food and drink, and the man responded that he couldn't help Mancia with food, but could provide something to drink. (RT at 77). The man led Mancia to the base of a staircase behind the Curry Village Store and then told Mancia "I'll be right back." (RT at 78). Mancia testified that the man told him he was an employee. (RT at 78). The man returned with a large jug of water and asked Mancia "will this work?" Mancia replied that it would, and the man told Mancia that there were two jugs he could sell Mancia for five dollars. (RT at 79). The man said he would take Mancia's money and ring up the transaction in the morning. (RT at 79). The man instructed Mancia to go grab one more jug and Mancia complied. (RT at 79). Mancia testified that there were two more men doing dishes inside a doorway adjacent to where he retrieved the second jug of water. (RT at 80). Mancia stated that the men gave him another half jug of water that was already opened. (RT at 80).

Mancia testified that he and his group encountered Siler after waking about ten feet from the area in which they had purchased the water. (RT at 81). Siler instructed Mancia and his male friends to sit down on a low wall, but did not address Underwood. (RT at 83). Mancia stated that a few moments after encountering Siler, the man who had sold Mancia the water emerged wearing a sports

5

jersey with a towel around his neck. (RT at 83). Mancia said "that's the kid...that I had given the money to," and he and Siler walked up to the man in the jersey to speak with him. (RT at 83). Siler instructed Mancia to "go back and sit down," and Mancia complied. (RT at 83-84). Mancia testified that Siler had a notepad in his hand and was writing down information as he talked to the man in the jersey. (RT at 83). Mancia did not testify that the man in the jersey told Siler he had sold Mancia the water.

According to Mancia, Siler "let the kid go" and returned to where Mancia and his group were waiting. (RT at 84). Mancia asked if he could get his money back from the man in the jersey, and Siler replied "no, but your going to have to return the water." (RT at 84). Mancia and his friends returned the two full jugs, but could not return the third jug because Mancia and his friends had consumed it already. (RT at 84). Siler issued Mancia a citation and told him he was free to go. (Rt at 84).

On cross examination, Mancia stated that he went back to the Curry Village store and spoke with the manager. (RT at 94). The manager stated he did not have any record of the transaction. (RT at 94). The manager performed a count of the water and stated that nothing was missing. (RT at 94).

**Underwood's Testimony**

Underwood testified that she was Mancia's girlfriend of approximately five years. (RT at 95). Underwood's testimony was substantially similar to Mancia's.[2] Underwood testified that she saw Mancia hand the man money in exchange for the water. (RT at

---

[2] Underwood estimated the height of the man who sold Mancia the water to be about one to two inches less than Mancia's estimation. (RT at 96).

**6**

1  99).  Underwood stated that she saw the man who took the money a
2  few moments after they encountered Siler, and that Mancia and Siler
3  went over and talked to the man.  (RT at 100).
4      During the government's cross examination, Underwood stated
5  that she had not spoken with Mancia about the case and that she
6  loved Mancia.  (RT at 100).

**Amicho Mancia's Testimony**

Amicho is Mancia's brother. (RT at 109). Amicho's testimony was substantially the same as Mancia's regarding the group's arrival at Curry Village. Amicho's testimony differed from Mancia's with respect to the initial encounter with the man who allegedly sold the group the water. Amicho testified that the man was smoking a cigarette, and that Amicho believed him to be an employee because of his green polo shirt and the fact that he had towels with him and "looked like a worker." (RT at 112). Amicho stated that the man did not tell him he was an employee. (RT at 113). Amicho testified that he saw Mancia give the man money in exchange for the water. (RT at 116). Amicho's testimony differed from Mancia's and Underwood's in that Amicho stated that either Underwood or Anthony gave Mancia the money to pay the purported employee. (RT at 123).

Amicho's testimony regarding the groups' encounter with Siler was substantially the same as Mancia's testimony. (RT at 15). Amicho testified that Siler and Mancia went to talk to the man that Mancia identified as the employee who sold him the water. (RT at 115). Amicho stated that Siler was taking notes as he spoke with the man who sold them the water. (RT at 126). However, Amicho estimated that about 10 minutes passed before the man who sold the

7

water emerged, whereas Underwood and Mancia estimated the time to be approximately five minutes.  (RT at 126).  Amicho did not testify that the man in the jersey told Siler he had sold Mancia the water.

On cross examination, Amicho testified that he did not discuss the case with Mancia or the other witnesses at trial. (RT at 119). Amicho also testified that he heard Mancia tell Siler that he had paid for the water. (RT at 127). During an inquiry by the court, Amicho said that no one in his group ever returned to the Curry Village store. (RT at 133).

**Trejo's Testimony**

Trejo's testimony was substantially the same as Mancia's regarding the group's arrival at Curry Village and their encounter with the man in the green polo shirt. (RT at 138-39). Trejo stated that he saw Mancia hand the man money in exchange for the water. (RT at 141). Trejo stated that Underwood gave Mancia the money to pay the man for the water. (RT at 146-47).

Trejo testified that upon seeing the man who sold them the water emerge in a jersey, "we kept on telling the ranger that that's the guy right there" but that the man in the jersey stated he had never seen the group before. (RT at 142). Trejo testified that he heard the conversation between Mancia, Siler, and the man in the jersey, and that the man in the jersey told Siler he had never seen Mancia and his group before. (RT at 150). Trejo did not know if Mancia returned to Curry Village the next day. (RT at 162).

///

///

### III. **STANDARD OF REVIEW**

An appeal from a criminal conviction imposed by a Magistrate Judge lies with a "judge of the district court and must first be brought in the district court before prosecution in the court of appeals." United States v. Soolook, 987 F.2d 574, 575 (9th Cir. 1993); see also 18 U.S.C. § 3402. The district court's review of the Magistrate Judge's judgment is governed by the same standard as an appeal from a judgment of a district court to the court of appeals. Fed. R. Crim. P. 58(g)(2)(D); United States v. McFarland, 369 F. Supp.2d 54, 56-57 (D. Me. 2005); United States v. Fautanu, 751 F. Supp. 1420, 1421 (D. Haw. 1990); United States v. Ramirez, 555 F. Supp. 736, 738-39 (E.D. Cal. 1983). In other words, the district court "is to apply the same scope of review as a United States Circuit Court of Appeals would apply in considering an appeal of a judgment from a United States District Court." United States v. Charrington, 285 F.Supp.2d 1063, 1066 (S.D. Ohio 2003).

A district court reviews a magistrate's factual findings for clear error and legal conclusions de novo. *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986). Mixed questions of law and fact are subject to de novo review; however, the factual findings that underlie the application of the law are reviewed for clear error. *Id.*; *United States v. Prieto-Villa*, 910 F.2d 601, 604 (9th Cir. 1990). A claim of insufficient evidence is reviewed de novo. *United States v. Hernandez-Orellana*, 539 F.3d 994, 1002 (9th Cir. 2008); *United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002).

///
///

9

## IV. Discussion

**A. Mancia's Claim of Clear Error[3]**

Factual findings rendered in a federal bench trial are subject to "clear error" review. *United States v. Brobst*, 558 F.3d 982, 998 (9th Cir. 2009). A finding is clearly erroneous if it is illogical, implausible, or without support in inferences that may be drawn from the facts in the record. *United States v. Guerrero*, 595 F.3d 1059, 1063 (9th Cir. 2010) (quoting *United States v. Hinkson*, 585 F.3d 1247, 1262 (9th Cir. 2009) (en banc)). A trial court's decision to accept one witness' testimony over another's is entitled to special deference, *Patton v. Yount*, 467 U.S. 1025, 1038 (1984), however, a reviewing court must reject a trial court's credibility determination where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed," *Anderson v. City of Bessemer*, 470 U.S. 564, 573-75 (1985).

Mancia contends that the trial judge's credibility determination was based on a clearly erroneous finding that is not permissible in view of the evidence presented at trial. The trial judge articulated his findings and ruling as follows:

> Some of the things that were said here today are frankly unbelievable to me, and they were some of the things that were said by your witnesses...

---

[3] Mancia asserts two related but distinct claims regarding the evidence underlying his conviction. First, Mancia raises a sufficiency of the evidence claim. Second, Mancia raises a claim of clear error regarding the trial court's credibility determination. The government does not contest Mancia's claim of clear error; rather, the Government contends simply that there was sufficient evidence to convict Mancia. The fact that there may have been evidence sufficient to sustain Mancia's conviction does not foreclose Mancia's claim of clear error. *See, e.g., Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946) (discussing clear error standard).

> [T]he witnesses you presented today were inconsistent on matters of major importance to me, such as the alleged meeting with the kid with the towel over his shoulder. You and one witness-one other witness said that the young man told the ranger, Yeah, I sold these guys water off the back dock...[4]
>
> Two witnesses said that the kid admitted selling water to you. One witness said that the kid said, I've never seen these guys before. Now, let's just stop and think about that one exchange for a minute. You've got an employee of Delaware North Corporation on his way either to or from the shower, and by your version a ranger is confronting him and asking him about selling water off the back dock, something that could cost him his job.[5]
>
> It's not going to happen. He's not going to say, Yeah, I'm selling water to these guys. That's not going to happen. The other thing that's not going to happen in my experience is forest rangers are going to walk into the back loading area where they don't belong, walk up to an employee, total strangers, and say, Hey, can you help us out, and Sure, I'll go into the back room; I'll take some of the company's water and sell it to you for cash right here in the back, even though it's going to cost me my job if they find out about it. That's not going to happen.
>
> That isn't the way the human experience works. *And if it- if this happened, if this happened the way your witnesses say it happened, then Ranger Siler would have seen it. He say's he didn't.* Now, what's the next question here. Is Ranger Siler perjuring himself?
>
> Either Ranger Siler is putting his career and his family's presence on the line just to get a conviction in this case, or it didn't happen the way your witnesses say it happened, *because if it did he would have seen it, and he didn't.*[6] And I believe his testimony.

---

[4] Mancia attempted to alert the trial court to the fact that this was not consistent with the testimony offered at trial, but the trial court ordered Mancia to "just be quiet." (Id.).

[5] There is no evidence on the record to support the trial judge's supposition that DNC would fire an employee for selling water to thirsty campers after hours and ringing the transaction up the following morning. In response to an inapposite hypothetical question posited by the trial court, Matern "imagined" that a person would be fired for "engaging in private backdoor sales of DNC merchandise for cash." (RT at 184). This is inadmissable speculation.

[6] There is no evidence on the record that Siler's family resides within the park.

11

(RT at 216-218)(emphasis added).

The trial court's statement reveals that the credibility determination was based, in large part, on three findings: (1) the trial court's finding that defense witnesses gave inconsistent accounts of the "alleged meeting with the kid with the towel over his shoulder;" (2) the trial court's "experience" regarding what forest rangers would and would not do under the circumstances Mancia faced; and (3)the trial court's finding that Siler would have seen someone sell Mancia the water if it had happened.

The trial court's finding that Siler would have seen the person selling Mancia the water if it had happened is clearly erroneous. Even when a trial court's findings are "permissible" in light of the record, if the trial court's determination is "illogical or implausible" or lacks "support in inferences that may be drawn from facts in the record," the determination is clear error. *Hinkson*, 585 F.3d at 1261. Siler's testimony is unequivocal: Mancia and his companions disappeared from Siler's view when they entered the back dock area of the Curry Village Store. (RT at 33; 41; 42-43; 199). In light of Siler's testimony, the trial court's finding that the defense testimony was not credible because Siler would have seen the individual selling Mancia the water is illogical, implausible, and without support in the record.

**B. Prejudice**

A federal court faced with a claim of nonconstitutional error on direct review of a conviction must determine whether the error "had substantial and injurious effect or influence in determining the...verdict." *E.g. United States v. Bruce*, 394 F.3d 1215, 1229

**12**

(9th Cir. 2005); *Kotteakos v. United States*, 328 U.S. 750, 764-65 (1946). As the Supreme Court explained in *Kotteakos*:

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand . . . . But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected.

328 U.S. at 764-65.

Whether an error had a substantial and injurious effect depends on the relationship between the error and everything else that transpired during the trial. *Kotteakos*, 328 U.S. at 1567; *see also United States v. Bauer*, 132 F.3d 504, 510 (9th cir 1997). However, a reviewing court's function is not to speculate as to whether a conviction would, or might probably, have resulted absent the trial court's error. *Bruce*, 394 F.3d at 1229. Unless the reviewing court can say with fair assurance that the verdict was not substantially swayed by the challenged error, a conviction tainted by clear error must be reversed. *See, e.g., Bruce*, 394 F.3d at 1229-31 (reversing conviction where trial court committed clear error). The "fair assurance" standard is satisfied where it is more probable than not that the error did not materially affect the verdict. *E.g. United States v. Morales*, 108 F.3d 1031, 1040 (9th Cir. 1997).

**1. The Trial Court's Finding Regarding its Experience with Forest Rangers**

The trial court stated two additional findings in support of its credibility determination. First, the trial court held that:

> in my experience...forest rangers are [not] going to walk into the back loading area where they don't belong, walk

**13**

> up to an employee, total strangers, and say, Hey, can you help us out, and Sure, I'll go into the back room; I'll take some of the company's water and sell it to you for cash right here in the back, even though it's going to cost me my job if they find out about it. That's not going to happen.

(RT at 217). Mancia testified that, at the time of trial, he was employed by the City of Fresno Parks and Recreation Division. (RT at 74). To the extent that the trial court's finding was that, because Mancia worked for the Parks and Recreation Division, he would not have entered an employee area to ask for help finding food and water, the trial court's finding is not based on any evidence presented at trial. The only ranger who testified at trial was officer Siler, who said nothing that supports the trial court's statement of extra-record knowledge. To the extent the trial court's statement regarding forest rangers was made in reference to what Siler would have done, the statement is virtually unintelligible and is not relevant to whether Mancia's testimony was credible.

### 2. The Trial Court's Finding Regarding Inconsistencies in the Defense Witnesses' Testimonies

The trial court's statement that Mancia and one other witness testified that someone admitted to Siler that they sold water to Manica demonstrates plain error. *See* Fed. R. Crim. P. 52. The trial court afforded significant weight to its misconception of the evidence:

> [T]he witnesses you presented today were inconsistent on matters *of major importance to me*, such as the alleged meeting with the kid with the towel over his shoulder. You and one witness-one other witness said that the young man told the ranger, Yeah, I sold these guys water off the back dock...

> Two witnesses said that the kid admitted selling water to you. One witness said that the kid said, I've never seen these guys before.

(RT at 218)(emphasis added). No witness testified that anyone ever admitted selling water to Siler. To the contrary, the only witness who testified regarding the content of the conversation between Siler and the person who allegedly sold Mancia the water was Trejo, who stated that the person told Siler he had never seen Mancia or his friends before. (RT at 142).

After announcing its ruling, the trial court commented that Mancia's case presented a "tough" decision. (RT at 217-18). In light of the fact that the trial court placed "major importance" on two factual findings that were clearly erroneous, there is no fair assurance or basis for confidence that the verdict was not substantially swayed by judicial error.[7] Mancia's conviction must be REVERSED.

**ORDER**

1. The judgments of conviction are REVERSED.

2. If the government chooses to retry the case, it shall do so in accordance with the requirements of law within 60 days.

IT IS SO ORDERED.

**Dated:   June 18, 2010**         /s/ Oliver W. Wanger
                                   UNITED STATES DISTRICT JUDGE

---

[7] Because reversal is required based on clear error, it is unnecessary to address Mancia's alternate claims for relief.